## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

—————————————————————

Alfred Flowers,                                                 Civil No. 04-CV-3959 (ADM/AJB)

                Plaintiff,

                                             **COMPLAINT FOR MANDATORY**
v.                                                                       **INJUNCTION AND NEGATIVE**
                                             **INJUNCTION - - *FIRST AMENDED***

City of Minneapolis, Minnesota,
Kevin Stoll, in his individual and
official capacities, and John Does 1-5,

                Defendants.

—————————————————————

## SUMMARY OF CLAIMS

Alfred Flowers has asserted his constitutional rights to defend in a state criminal action. His defense have always been that the real perpetrators are the police who, without cause, took him to the ground and physically assaulted him, then abused their charging authority to cover up their own misconduct. He is a witness at his own trial, which was scheduled to start on August 30, 2004, but has been continued until **September 13, 2004**. In retaliation for his defense, or for other unconstitutional purposes, Flowers and his family have been harassed, terrorized, and threatened. As trial neared, harassment escalated.

Lt. Kevin Stoll of the MPD, who lives just down the block from Flowers, misused the police department systems by: 1) announcing at roll call that he would buy a steak dinner for any officer who could take Flowers down on a crime; and 2) falsely listing Flowers' house as a "gang" house, in an "alert" that was read aloud to police officers at roll call. This was intended to incite violence toward Flowers, and a number of police squads did harass Flowers at his house throughout August. Flowers' wife and children are terrified.

Late in the afternoon on Friday, August 27, 2004, Flowers learned from police that:

Minneapolis police had put a "hit" out on him.  Flowers reported this to Minneapolis Police

Department Internal Affairs, the U.S.D.O.J., the F.B.I., and Minneapolis Police Chief McManus.

At the suggestion of the F.B.I., Flowers was moved out of the City until this case could be filed.

### *Since filing the Initial Complaint*

Since filing the initial Complaint, Flowers has continued to receive information that he

was falsely identified as a "gang" member, and to date, Flowers' information is that the

Minneapolis Police Department has still not affirmatively withdrawn the "alert" or otherwise

informed its force that Flowers is not a gang member.  Flowers continues to fear for himself and

his family.

### FLOWERS SEEKS INJUNCTIONS

- To prohibit further unconstitutional harassment, threats and terrorism by police; and

- To require the Minneapolis Police Department affirmatively to remove the "alert" from

  its system, and to notify all its officers that the alert contained false information, and that

  no criminals live at the Flowers' house.

### PARTIES

1.  Plaintiff Alfred Flowers is a Black man, who resides in Minneapolis, Minnesota.

2.  Defendant City of Minneapolis is a municipality in the State of Minnesota.

3.  Defendant (Lt.) Kevin Stoll is an individual who resides in Minneapolis, Minnesota, and also

    is a Lt. with the Minneapolis Police Department, First Precinct.  He is sued in his individual

    and official capacities, and he acted with intent to harm, reckless disregard, deliberate or

    willful indifference, or with malice toward Flowers and his family.

4.  John Does 1-5 are reserved for other MPD officers who harassed Flowers, and supervisors who failed to take action, and others who intentionally or recklessly spread false information about Flowers, but whose identities are unknown at time of filing.

## JURISDICTION

5.  Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over this matter, which arises in part under the laws of the United States including 42 U.S.C. §1983.  This Court has the authority to take jurisdiction over all other claims, as supplemental jurisdiction.

## FACTUAL STATEMENT

*SEPTEMBER 27, 2003*

1.  **911 Call is not based on actual Disruption.**  On September 17, 2003, Flowers went to a Minneapolis-branch NAACP ("NAACP") meeting held at the Urban League ("UL"), to speak about then-President Gallmon's endorsement of Jennings for Superintendent of Minneapolis Schools, and to complain about the NAACP's use of federal funds in a local program and an overall abuse of NAACP funds.  Audiotapes of the NAACP meeting prove that Flowers voiced his concerns in a normal, matter of fact way, and was not disruptive. The Affidavit of NAACP member Carol White suggests that Gallmon's decision to call the police was motivated not by anything Flowers said or did, but that Gallmon falsely claimed Flowers was disruptive as a pretext to call police.

2.  **NAACP President Gallmon sees Opposition Leaders in Lobby and needs Pretext to derail Meeting.**  It is also undisputed that numerous other leaders of the Black community, including Minneapolis City Councilmember Natalie Johnson Lee, State Representative Neva Walker, State Representative Keith Ellison, Ward Bell, Jr., Ezel Jones, Spike Moss, Rev. Randy Staten, and others, were present to challenge Gallmon's authority.  According to

3

NAACP member Carol White, Gallmon followed her out to the lobby as she left and saw

these people before he returned to the Executive Committee meeting.  He must have known

that his authority would be challenged by that group, and that he would be called to account

at the General Membership meeting, which was supposed to start as soon as the Executive

Committee meeting ended.  Before it ended, he saw to it that police were called.  If the idea

was to avoid accountability, Gallmon succeeded, since the General Membership meeting was

shut down.  Gallmon submitted his resignation that day and never did have to explain his

conduct.

3.   **No factual basis exists for allegation of "Violence."**  Flowers has always argued that

NAACP leadership used allegations against him to force an end to the meeting when it

looked like the meeting would have a negative impact on the current leadership.  NAACP

leadership asked Torrence Abercrombie to call 911 and have Flowers ejected.  Abercrombie

apparently became frustrated when police did not arrive quickly, so after repeated calls he

finally called alleging Flowers had become "violent," even though there was no factual basis

for that allegation.

4.   **Flowers shown leaving on his own when Police Arrive.**  Minneapolis Police did eventually

arrive.  UL Security-cam video footage proves that Flowers was already leaving on his own

when Minneapolis Police Officers Becker and Tschida arrived.  Police left.

5.   **Urban League President Hightower instructs Flowers to re-enter Building; Flowers**
     **Leaves.**  After he left the building, Flowers  talked outside on his cell phone with UL

Executive Director Clarence Hightower.  It is undisputed that Hightower told Flowers to go

back into the building to put Abercrombie on the phone.  Video images prove that Flowers

entered, and Abercrombie called 911 to say that Flowers had returned just as Flowers handed

Abercrombie his cell phone.  After Abercrombie talked to Hightower on Flowers' cell phone, Flowers left and was walking down the sidewalk when approached by Minneapolis Police.

### *Terry stop issues*

6. **Officer Mooney stops Flowers.**  Officer Mooney of the Minneapolis Park Police pulled his squad car to the wrong side of the street, followed Flowers down the block, then emerged from his car to speak with Flowers.

7. **Officer Mooney questions Flowers.**  Mooney asked Flowers a few questions.  The video images prove that the conversation was quite short.  Officer Mooney admitted under oath that he **never suspected Flowers of a crime**.

8. **Officer Mooney takes Flowers down with "Scant Evidence."**  Mooney admitted and the Hennepin County District Court acknowledged that Mooney took Flowers to the ground, thereby arresting him, based on "scant" evidence."

9. **Officer Mooney admits Flowers not told he was under arrest before the Take Down.** Mooney admitted during pretrial hearings that he did not tell Flowers he was under arrest prior to grabbing him.

10. **Back-up arrives and uses more Force against Flowers.**  Two "back-up" police officers, Becker and Tschida, arrived and also used force on Flowers.

11. **Police contend Flowers resists Arrest, but make no initial claims against Clemons.**  Alisa Clemons is the sister of Al Flowers, and a former Minneapolis Police Officer.  The State contends that Flowers resisted arrest by squirming on the ground and refusing to get into the squad car right away.  Police never suggested at the scene or even later at the Fourth Precinct Stationhouse that Clemons obstructed the arrest by grabbing an officer.  However,  Police later contended that Clemons did so, and Minneapolis filed criminal process against her.

12. **Defendants maintain Police acted Improperly and had Ulterior Motives.**  Flowers and Clemons have always alleged that Police stepped over the line, violating their constitutional rights.  They have always maintained that police beat Flowers while in handcuffs, and that Clemons, a former MPD Sergeant herself, tried to talk sense to the Officers.  She only talked.  She did not intervene physically.  Flowers and Clemons have always protested that the criminal charges filed against them were specifically and intentionally designed to protect police from allegations of misconduct (or to "dirty" Clemons as a credible witness for her brother), or to protect the City from civil liability.

13. **Flowers is beaten and choked after he's Hand-cuffed.**  Numerous Black eyewitnesses swore under oath that Flowers was beaten by police after he was on the ground and in handcuffs,

> Al was already hand-cuffed, and police officers started beating on him.  …
> I saw more than one police officer hit Al with a fist, more than one hitting
> him in his stomach, I saw one of them take out a black stick and strike Al
> with it.  …  Several teenagers standing across the street were yelling,
> "police are beating on a Black man."  The police misconduct was drawing
> a crowd on the other side of the street.  In my view, Al's conduct was not
> what was drawing a crowd, but rather the way that the police were beating
> on him.

Several eyewitnesses also swore that Flowers *could not* get into the squad car because a police officer had him by the throat:

> I went toward where police were because I was worried about what was happening.  I
> found Flowers down in the middle of the police.  They were hitting him.  One officer had
> his knee on Flowers and another had his hands around Flowers throat.  I could tell
> Flowers was in distress and I wanted to make sure that that officer got his hands off
> Flowers (sic) throat, so I pushed his hands off Flowers (sic) throat.

This life-threatening choke-hold evidence was never challenged by the City Prosecutors.

### *The state criminal charges*

14. **Flowers is charged with Resisting Arrest.**  Flowers was charged with obstructing legal

    process under Minn. Stat. §609.50.  The Prosecution admits that Flowers was arrested for –

    resisting arrest.  (Hereinafter "Resisting Arrest").  The Prosecution also admits that the **sole**

    **basis** for this charge is **resisting arrest**.

15. **Flowers is cited for Disorderly Conduct at the Scene;  Flowers and Clemons later**

    **charged and plead "Not Guilty."**  The citation also included a disorderly conduct charge

    under Minn. Stat. §609.72 ("DC").  The incident occurred on **September 27, 2003**.

    Flowers was given a citation that day, but Clemons was not.  Flowers and Clemons were

    both served with criminal process by Complaint dated October 24, 2003.  They both pled

    not guilty on November 17, 2003.

16. **Flowers maintains Staten saved his life; Charges against Flowers Improper and**

    **Evidence should be Suppressed.**  Flowers has always protested that Police were choking

    him **to death** when Rev. Randolph Staten intervened **to save his life**; and

17. **Defendants maintain in Pretrial Motions that Prosecution is Improperly Motivated.**

    In their Pretrial Motions, Defendants protested that these criminal charges are intended:

    - To cover up police misconduct – so that the guilty officers can avoid civil and

      criminal liability; or

    - To forestall civil liability against the City of Minneapolis (a misuse of <u>Heck v.</u>

      <u>Humphrey</u>).

18. **Flowers and Clemons vigorously Defend.**  Flowers and Clemons have asserted their

    right vigorously to defend against state criminal charges that they believe are not only

    false, but a misuse of the courts.  Flowers and Clemons filed a Petition for Writ of

Mandamus or Prohibition with the Minnesota Court of Appeals on August 11, 2004.
They filed a Petition for Writ of Supervisory Control with the Minnesota Supreme
Court on August 25, 2004, supplemented on August 30, 2004 (with information about
police harassment of Flowers).  That Petition is pending.

*Police retaliation for exercise of constitutional rights*

19. **<u>Minneapolis Police regularly Misuse Charging Authority</u>**.  The misuse of the criminal
charging process is a pattern and practice, or a policy and custom in the City of
Minneapolis.  Minneapolis Police routinely violate constitutional rights of members of the
Black community, including but not limited to physical assaults (without cause or
justification) or retaliation for assertion of constitutional rights (such as a physical beating
for saying "I didn't do anything wrong").  Minneapolis Police regularly misuse their power
to instigate a criminal charge, in order to cover up their own unconstitutional conduct,
designed to protect themselves from criminal liability, or to protect them or the City from
civil liability.  Police are taught by the Minneapolis Police Department ("MPD") to prepare
their police reports together, so that they can make them match (even if their memories
don't).  Police regularly make charging decisions in their own self interest.  This is
encouraged, condoned, or not prevented by the MPD.

20. **<u>Police are Upset that Flowers and Clemons have not Plead Guilty.</u>**  Minneapolis Police
are so used to misusing their charging authority, and achieving guilty pleas (that protect
them from civil liability under Heck v. Humphrey, and as a practical matter protect them
from criminal liability), that they become angry and upset when one of their victims does
not plead guilty.  Flowers and Clemons have steadfastly refused to plead guilty.  Not only
does the law not require them to do so, they are constitutionally protected in asserting their

right to fully litigate the state criminal case, and to have a jury of their peers decide the case.  A number of Minneapolis Police Officers are upset with Flowers and Clemons for refusing to plead guilty, or otherwise for vigorously defending.  In pretrial motions in state criminal court, Flowers and Clemons proved that a number of Minneapolis Police Officers lied under oath, including but not limited to Shannon Barnette ("Barnette"), a Sgt. in the 4th Precinct and a friend of Kevin Stoll, and Officer Tschida.  Their lies were affirmatively proven through video footage.

21. **Hatred of Clemons fueled by earlier Civil Rights cases.**  Barnette and other Minneapolis Police Officers have disliked Clemons for some time.  While a Minneapolis Police Officer herself, she filed 2 civil rights cases against the City, alleging race discrimination and retaliation.  One of the individuals who Clemons complained about was the partner of Barnette.  Those cases were settled by the City, but many police officers cannot put it behind them.  Minneapolis Park Police Officer Mooney (the one who took Flowers to the ground) stated under oath in the state criminal action, that the only thing he knew about Alisa Clemons prior to this case was that she had sued the Minneapolis Police.

22. **Hatred of Flowers fueled by earlier lawsuits**.  The 16-year-old daughter of Alfred Flowers was beaten by Minneapolis Police, and asserted her constitutional right to file a civil rights action.  That case was settled by Minneapolis.  But some cannot forget it.  As high as the Minneapolis City Council, some connected with Minneapolis still hold this against Flowers.

23. **Minneapolis Police regularly retaliate against those who allege police misconduct**.  There is a pattern and practice (or custom and policy) within the Minneapolis Police Department of officers and their friends and associates, retaliating against those who allege

police misconduct.  This is not limited to harassment by the subject of the complaint, but based on some notion of "protect our own," or friendship between officers, or other, numerous police officers usually direct, carry out or facilitate the retaliation.  One of the ramifications of the regular abuse of power by police (without consequences) is that in their boldness, they assume that they can do anything, and they will not be caught, because no other police officer will testify against them.  Even if "caught," police assume that they can fabricate a defense, and that members of the public will believe a white police officer in uniform over a black criminal defendant.  This has been an effective technique for Minneapolis Police for many years.  Despite recent changes in the Internal Affairs Unit in the MPD, many Minneapolis Police still feel "invincible," which has contributed to the way in which this civil rights case developed.

***Federal Mediation***

24. **Citizens request Federal Mediators**.  In August 2002 several concerned citizens requested that the United States Department of Justice, Civil Rights Division, Community Relations team, come to Minneapolis to negotiate between communities of color and the Minneapolis Police.  Communities of color were deeply concerned about misuse of authority, violation of rights, and outright assaults by Minneapolis Police against members of their communities.

25. **Flowers on Community Negotiating Team when attacked by Police**.  After much deliberation with the Minneapolis City Council, Federal Mediation commenced.  The "community" was represented by a negotiating team.  Police had their own negotiating team.  Al Flowers was a member of the community negotiating team.  The event on September 27, 2003 took place while Flowers was a member of the Federal Mediation

community negotiating team.  In fact, a highly-placed Police Manager argued that Flowers should no longer be allowed to attend mediation sessions, due to the criminal charges against him (which had been instigated by Minneapolis Police).  For these reasons, this case has had even more propensity to engender animosity of Minneapolis Police Officers and managers.  It is undisputed that high-ranking Minneapolis Police managers were involved in the decision to charge Flowers with obstructing legal process, including sergeants, lieutenuits, "Car 9" (the highest-ranking officer on duty) and then Chief of Police Olson.

### *MINNEAPOLIS POLICE HARASSMENT OF ALFRED FLOWERS*

26. **Harassment and Retaliation Commence.**  In **July-August 2004**, when it became clear that Flowers would not plead guilty and that the case would advance to trial, Police started to harass and retaliate against Flowers at his home in South Minneapolis.  Even if this was not the motivation, Police did begin to harass Flowers and his family at their home that is located in the 5th Precinct.

27. **Harassment involves Spotlighting House.**  Shining a squad spotlight into a house is a common form of police harassment and intimidation employed by members of the MPD. Starting in July, and continuing into August 2004, Minneapolis Police squad cars would drive by Flowers' house, while shining their spotlights into his house.  From inside the house, this is a terrifying experience.  Particularly for those who have already felt the wrath of police who refuse to obey the law, Flowers and his family were worried that they would be harmed and *no one would come to their aid*  - because they would side with police.  Flowers knows knows that Minneapolis Police have guns and that some will enter a house without regard for the Fourth Amendment, and make up stories later to cover their actions.

28. **Numerous squads gathered.**  On one night in July 2004, 5-6 squads gathered outside Flowers' house.  They approached his front door, implying that they had received a 911 complaint from a neighbor, and asked to come inside.  He asserted his constitutional right to refuse their entry.  They did not push inside, but they were not happy about it.

29. **Spotlighting causes Flowers family to be Afraid.**  Flowers' wife was scared.  His children were terrified.  They slept on the floor because they did not know if police were looking in the window, or about to come into the house.   One night, on or about August 10, 2004, the children observed a Minneapolis Police Squad drive up into the alley that is just behind their house, and get out of his car – coming toward the house.  The children were terrified, and ran upstairs.  When they came down, a window in the back door (nearest the alley) had been broken.  Upon information and belief, the window was broken by the Police Officer.  Squad 531 did record in its daily log for that date that it visited Flowers' house and that it checked the "alley."

30. **A number of squad admit targeting Flowers' house**.  Flowers has obtained a number of daily logs for 5th Precinct squads for August 2004, and they do confirm visits to his address.  These entries are mostly labeled "D.P." – direct patrol.  This means that there was no 911 call, but police are themselves deciding to visit the house.  Flowers has confirmed that no 911 calls were made by neighbors, complaining about him or his house, the entire summer.

31. **Tension Grows.**  The squads continued to come around, shining their spotlights into Flowers' windows, usually between 8:30 p.m. and 1:00 a.m..  Tension grew in the house, and the fear level continued to rise.  The children began sleeping on the floors of their bedrooms, worried that police would come into the house.

32. **Harassment reported to MPD; Officers ordered to stop Harassment; Harassment**

   **Continues.**  In mid August, Flowers had his attorney contact MPD Police Administration to

   report the harassment.  Upon information and belief, following that initial complaint, 5th

   Precinct Inspector Arneson  gave a direct order to her officers to stop harassing Flowers, and

   to stop driving by his address.  Even faced with a <u>direct order from a superior officer</u>, the

   officers did not stop their harassment of the Flowers' house.  This is evidence of lawlessness.

   It is evidence that some MPD Officers <u>do not respect the law</u>, <u>do not respect authority</u>, and

   are <u>out of control</u>.

33. **Flowers learns that Reward offered to any Officer that can "get"him.**  As trial drew

   closer, the harassment of Flowers escalated.  After the Minnesota Court of Appeals denied

   Flowers' Petition for Writs on **August 27, 2004**, which upon information and belief traveled

   quickly inside the MPD grapevine and emboldened police, Flowers learned that Lt. Kevin

   Still (a defendant herein) had publicly promised at a roll call in the Fifth Precinct that he

   would buy a steak dinner for any officer who could "get" Flowers.  Flowers took this use of

   the word "get" to mean that false criminal charges would be alleged against him.  (At the

   time, he did not consider the possibility that "get" could mean something far more sinister.

   But even the interpretation Flowers placed on the term at the time was frightening enough.)

   A false arrest by force can result in death, and police have been successful in the past

   fabricating an alleged use of force by the Black man, to cover up their own misconduct.  This

   is an effective way for police to kill the victims of their misconduct without consequences,

   particularly when those victims are characterized as a threat to the officer(s).  This is a harsh

   reality for Black men in Minneapolis, and there are a myriad of studies that support the

grossly disparate treatment of Blacks by police.  Minnesota has the worst record of any state in the nation, for the disproportionate conviction of Blacks.

34. **Purpose of harassment appears to be Punishment for Defense of Criminal Case.**  The harassment seemed designed to cause an arrest of Flowers prior to or during trial  or to otherwise punish Flowers for exercising his right to complain about police misconduct and to pursue a defense in this criminal case.  By harassing him so close to trial police can accomplish several things:  1) distract his attorney so that she cannot spend adequate time preparing his defense for trial; 2) put Flowers in jail, so that he is in custody during trial, limiting his effectiveness during trial or tainting the jury pool by disseminating the information via local media; and/or 3) disrupting the trial itself.

35. **Kevin Stoll has tracked state criminal case**.  Commuter records from the Minneapolis Police Department prove that Defendant Stoll used a computer to access and view the Minneapolis Police Report about the September 27, 2003 event that led to Flowers' and Clemons' prosecution.  There is no legitimate reason for Stoll, who is assigned to the 1st Precinct, and who was not at the scene, consulted at the time, or otherwise assigned any duties on that case, to view the Minneapolis Police Report for that incident.  Yet he did so within days of the incident.  And then he accessed that electronic police report <u>again</u> in August 2004.

36. **Flowers learns "Hit" out on Him.**  Then, later on Friday afternoon, **August 27, 2004**, Flowers learned from a police officer that police had put out a "hit" on him.

37. **Flowers notifies Internal Affairs and U.S. Attorney.**  Flowers was already in the process of complaining to Minneapolis Internal Affairs about the continued harassment, and the

promise of a "steak dinner."  Once he learned there was a "hit" out on him, he included this

in his complaint to Internal Affairs.  His attorney also contacted the U.S. Attorney's Office.

38. **Flowers calls FBI.**  Flowers' Attorney spoke with the Acting U.S. Attorney .   He

recommended that Flowers' attorney call the F.B.I.

39. **FBI suggests Flowers move to Secure Location**.  Flowers' Attorney then called and

reported the threats by Minneapolis Police to the F.B.I.  She expressed concern that she could

not file for a TRO in federal court until Monday morning, and was concerned what might

take place over the weekend.  The F.B.I. suggested that Flowers be moved to a location away

from his house and out of the City, for the weekend.

40. **Flowers learns his house was listed on False "Gang and Drug" Alert which could be**

**used to Justify Attack.**   While plans were being made to move Flowers out of the City,

Flowers and Clemons learned even more disturbing information – that MPD Lt. Kevin Stoll

had abused the MPD "alert" process, which enables  officers to "alert" fellow officers about

known criminals so they can be on the look-out for them.  Lt. Stoll, working with Officer

Appledorn of the Organized Crime Unit ("OCU"), had the MPD issue an "alert" that listed

Flowers' house as a known gang house.  Upon information and belief it listed Flowers as a

gang member and convicted criminal, and Clemons and others as "criminal associates."

There *has never been any* factual basis for the "alert."  Flowers has never been alleged to be

involved with any gang, nor is his house a gang or drug house.  (Flowers is a daycare

provider.  His house is clean, his wife has taken care with interior decorating, and it is full of

children.)  Clemons has a clean criminal record.  The only Minneapolis Police case in the

system regarding Flowers and Clemons is *the state criminal case* described above.  The

"alert" (by whatever name given to it by Police, and however disseminated) caused

additional concern, because it was clearly designed to put the Flowers house at risk.  Police

Officers who did not know Flowers would suspect criminal dealings, guns and drugs, which

could motivate a forced and armed entry and police shootings and death.  Police Officers

with a vendetta against Flowers could intentionally perpetrate violence against Flowers, then

use the "alert" to justify their conduct.  It appeared that the "alert" might have been read city-

wide, at every roll call, during every shift, at every precinct.

41. **Lt. Stoll observed driving past Flowers house repeatedly before and after Attorneys**

   **Arrive.**  Flowers contacted his attorney.  Before attorneys arrived at the Flowers residence,

   Lt. Stoll was observed driving past in his convertible several times, stopping by Flowers'

   vehicle, and looking toward the house.  After the attorneys arrived, Lt. Stoll was observed

   driving past the Flowers residence at least 2 more times.  The first time, he turned his lights

   off when he drove passed, but just in front of Flowers' house.  The result was quite

   intimidating.  Stoll also slowed down when he came to Flowers' attorney's car, as if he was

   checking license plate number (upon information and belief Stoll had run other license plates

   parked in front of the house, and listed those people on the gang "alert").  Flowers' attorney

   observed how much tension this caused to the residents of the house.  She personally

   observed the level of intimidation that police can cause when they drive by a house, with

   known malicious intent.  The impact is far more devastating than being harassed by the

   average citizen, because you know that the individual/s is armed, and because you know that

   they have power and authority which they are willing to abuse.

42. **Flowers' Attorney contacts Chief of Police; Requests Retraction of "Alert."**  Flowers'

   attorney contacted Minneapolis Police Chief McManus directly a short time after Flowers

   learned about the "alert."  She complained about all of the above, let him know the fear level

in the Flowers' household, and that Flowers legitimately feared for his life.  She also asked that the "Alert" be immediately retracted, so that no officer can claim the alert as justification for attack.  She reported that the refusal by Police Officers to follow the direct order of their Precinct Inspector was perhaps the most frightening aspect.

43. **Flowers moves to Secure Location.**  Flowers was then moved out of the City.

44. **Flowers believes order to stop Harassment made but fears it will not be Obeyed.**

Apparently upper management of the MPD did give orders that night, for their officers to stand down – to cease and desist driving by the Flowers house.  But that order had been disobeyed before, and Flowers learned that several officers were "unhappy" about the order that was reiterated on August 27, and he fears further lawlessness and refusal to comply with order.

45. **Harassment prevents Attorneys from focusing on trial Preparation**.  Flowers' attorney has had to deal with police harassment since she became aware of it, and, it has taken time away from trial preparation.

46. **MPD aware that Flowers has been Moved.**  By Saturday morning, **August 28, 2004**, the Minneapolis Police had already learned from their sources that Flowers was out of his house, and that he was receiving phone calls from MPD upper management on his cell phone in his (hopefully) secure location.

47. **High-ranking Officer visits Stoll**.  Also on Saturday morning, August 28, 2004, a high-ranking officer in the MPD visited Stoll at his home.  At that point, Stoll became aware of Flowers' complaint about *him*.

48. **To date, no word from MPD**.  Other than the call to Flowers on Saturday morning, Flowers and his attorney have not received any communication from MPD that, and do not know whether the "alert" was deleted and its falsity announced.

49. **Stoll and other MPD Officers are Spreading Falsities About Flowers.**  Defendant Stoll has told neighbors about Flowers being a gang member, and/or his house a gang house.  They are false and malicious lies, intended to turn Flowers' neighbors against him.  Upon information and belief Stoll's communication to neighbors has resulted in at least one neighbor complaining to MPD about the "trash" and a gang house on her block.  In addition, a Sgt. from another Unit has told Flowers' neighbors that he is a gang member, or that his house is a gang house.  That Sgt. even named the gang that she was accusing Flowers of being involved with.  By doing that, she risked that rival gangs would learn this information, and that *they* would perpetrate violence against Flowers or his family.  That Sgt. is friends with Officer Appledorn, and upon information and belief learned the "gang" rumor from her, and therefore also knew its falsity.  These are either intentional falsities, or are made with reckless disregard for Flowers' rights and safety.  MPD's records show no complaints from neighbors including specific evidence of Flowers' house being involved with a gang, except for a report from Defendant Stoll.

50. **Neighbors are turning against Flowers**.  Flowers has observed that neighbors that were once friendly, do not want to speak with him.  Upon information and belief, this is because they have been told by Stoll or other MPD Officers that Flowers is a gang member, or that his house is a gang house.

51. **Flowers' 13-year-old daughter approached at School.**  This case began with a Park Police Officer taking Flowers to the ground.  On September 2, 2004, a Minneapolis Park Police

Officer assigned to a middle school, approached Flowers' daughter and asked if she knew or was related to Alisa Clemons. She confirmed that Clemons was her aunt. There was no legitimate reason for the Officer to approach the daughter, or to ask about Clemons. Flowers fears that police may harm his daughter, and his attorney notified the Chief of Park Police.

52. **Information requests from MPD still outstanding.** Flowers has requested various documents from the MPD, and still await the delivery of many. In particular, Flowers has requested a copy of the "alert" (by whatever name) that notified police that he is a gang member or that his house is a gang house. To date, Flowers has not been supplied a copy of same. Flowers asserts, upon information and belief, that police officers who fears for their own liability have intentionally destroyed evidence of their guilt – evidence that Flowers needs to pursue his claim in this case. Upon information and belief Minneapolis Police Officers have a network designed to help each other cover up their illegal activities, and that Officers and supervisors have actively worked to destroy evidence, or to fabricate "justification" for the illegal conduct complained of herein.

## COUNT I

### Violation of 42 U.S.C. §1983
### (Against all Defendants)

Plaintiff realleges all foregoing information as if fully set forth herein.

53. Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

54. This claim arises under Title 42 of the United States Code (Civil Rights Act of 1964, as amended), including but not limited to §1983.

55. Defendants acted alone and/or together (2 or more in concert), and one or more of them committed some act in furtherance of the conspiracy to violate Plaintiff's rights (and Plaintiff was damaged).

56. Defendants deprived Plaintiff of his rights, privileges, and immunities secured by the United States Constitution, and specifically the Fourteenth Amendment to the United States Constitution, in conjunction with other rights, including but not limited to the following clearly established rights:

    a.    **Substantive due process**.  Defendants' actions, harassing and terrorizing Flowers, and his wife and children, misusing police processes in order to incite violence against Flowers, to the point where Flowers no longer feels physically safe in his home and fears for the safety of his family, shocks the conscience of the community.

    b.    **Procedural due process and/or equal protection**.  Harassing Flowers because he has asserted his constitutional right to defend himself in a state criminal action, or because he exercised his constitutional right to complain about government, violates his constitutional rights (sometimes described by courts as violation of due process, and sometimes as violation of equal protection).

    c.    **Sixth Amendment right to Effective Assistance of Counsel**.  Conduct of Lt. Stoll and other MPD Officers as set forth herein has compromised Flowers' Sixth Amendment right to effective assistance of counsel, because his attorney has been busy due to the harassment issues, rather than concentrating on preparing for trial.

    d.    **Equal protection of the laws**. Flowers is a Black man. Minnesota statute relating to identification as gang member require that specific criteria be met, rather than judging someone as a gang member because of their "appearance."  Flowers was identified as a gang member either because he is Black, or because he has asserted his constitutional rights (as described herein) and as such has been denied equal protection of the law.  He has been mistreated either due to his class – Black – or because he is an *Olech* "class of one."

    e.    **Access to courts/retaliation (or other articulations found in the First Amendment)**:  The conduct of Defendants denies Flowers access to Court in his

own defense in the state criminal action, or retaliates against him for asserting his rights.

      f.     **Failure to Protect**:  Several Minneapolis Police Officers and Supervisors knew that Minneapolis police officers were harassing and threatening Flowers, and they failed to do their duty to protect Flowers.

      57.    Defendants (and each of them) knew they were violating the federal law and constitutional rights of Plaintiff and/or acted with deliberate indifference to the rights of Plaintiff as noted above.  The Defendants acted under color of law (public officials acting alone and/or conspiring with private officials) of a statute, ordinance, regulation, resolution, policy, custom or usage when they deprived Plaintiff of his Constitutional rights, privileges, and immunities.  MPD Officers and supervisors acted with reckless disregard or with deliberate indifference to the rights of Plaintiff, or they acted with intent to harm.

      58.    As a direct and proximate result of the Defendants' conduct, inaction, policy or customs as set forth in more detail above, Plaintiff suffered the deprivation of his constitutional and/or federal statutory rights and suffered personal injuries, including injury to her career/loss of income, humiliation, mental anguish and suffering, and emotional distress.  Violative policies and customs of the Minneapolis Police include but are not limited to:

- Providing easy and unmonitored ability to officers (particularly supervisors) to list someone as a "gang" member without that individual meeting any of the criteria for "gang member" under Minnesota law, thereby placing the individual at risk.

- Failing to have any checks and balances to prevent misuse of the "gang" database, whereby police list individuals at "gang" members.

- Placing individuals on the "gang" list merely because of their race, rather than due to their meeting 3 of the 10 criteria under Minnesota law required to identify an individual as a gang member.

- Failing to monitor activities of police to prevent violation of constitutional rights of members of the public (including but not limited to criminal assaults by police; misuse of

the criminal charging authority; and retaliation for exercise of constitutional right to complain about police or defend a criminal action commenced by Minneapolis Police).

- Failing to discipline or provide other consequences for police who violate the constitutional rights of members of the public (see list directly above).

60.     By reason of the foregoing, Plaintiff is entitled to a negative injunction against Defendants, prohibiting them from further harassing, threatening, retaliating, intimidating, or tampering with Flowers, and a mandatory injunction requiring Defendant MPD to delete the "alert" from its computer systems, to delete Flowers' name from the "gang" database, and affirmatively to notify all police who were told that Flowers' house was a "gang" house, that that information was false, and that no one with a criminal record lives at his house.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief in the form of an injunction against Defendants, and each of them, and/or as follows:

1.     Issuing a temporary and/or permanent injunctions as described in Count I, above.

*** 

Dated:  September 10, 2004                         **ATTORNEYS FOR PLAINTIFF**
                                                   **JILL CLARK, P.A.**


                                                   _____s/jillclark_____
                                                   By:  Jill Clark, Esq. (#196988)
                                                   2005 Aquila Avenue North
                                                   Minneapolis, MN 55427
                                                   PH:  (763) 417-9102