# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| Alfred Flowers, | Civil No. 04-CV-3959 (ADM/AJB) |
| Plaintiff, | |
| v. | **STIPULATION FOR SECOND** |
| | **AMENDED COMPLAINT** |
| City of Minneapolis, Minnesota, | |
| Kevin Stoll, in his individual and | |
| official capacities, Sherry Appledorn, | |
| in her individual and official capacities, | |
| Erika Christensen, in her individual and | |
| official capacities, and John Does 1-5, | |
| Defendants. | |

_____

The parties stipulate to the attached Second Amended Complaint and it is hereby served and filed.

**So stipulated:**

Dated:  November 29, 2004                  **ATTORNEYS FOR PLAINTIFF**

_____s/jillclark_____
Jill Clark (#196988)
Jill Clark, P.A.
2005 Aquila Avenue North
Golden Valley, MN 55427
(763) 417-9102

**So stipulated:**

Dated:  December 1, 2004                  **JAY M. HEFFERN for**
                                          **DEFENDANT CIT Y OF MINNEAPOLIS**

_____s/jamesamoore_____
James A. Moore (#16883X)
Assistant Minneapolis City Attorney
333 South 7th Street, Ste. 300
Minneapolis, MN 55402
(612) 673-2063

Dated:  November 30, 2004                    **ATTORNEYS FOR DEFENDANT**
                                              **KEVIN STOLL**


                                                 s/karinepeterson
                                              RICE, MICHELS and WALTHER
                                              By: Karin E. Peterson (#185048)
                                              10 Second St., NE, Ste. 206
                                              Minneapolis, MN 55412
                                              (612) 676-2300


                             \*\*\*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

_____

| | |
|---|---|
| Alfred Flowers, | Civil No. 04-CV-3959 (ADM/AJB) |
| Plaintiff, | **SECOND AMENDED** |
| | **COMPLAINT FOR MANDATORY** |
| v. | **INJUNCTION AND NEGATIVE** |
| | **INJUNCTION AND DAMAGES** |
| City of Minneapolis, Minnesota, | |
| Kevin Stoll, in his individual and | |
| official capacities, Sherry Appledorn, | |
| in her individual and official capacities, | **JURY TRIAL DEMANDED** |
| Erika Christensen, in her individual and | |
| official capacities, and John Does 1-5, | |
| | |
| Defendants. | |

_____

**SUMMARY OF CLAIMS**

Alfred Flowers brings claims for injunction and damages, based on 42 U.S.C. sec. 1983, defamation, for violations of the Minnesota Constitution, and for defamation and intentional infliction of emotional distress.

**PARTIES**

1.      Plaintiff Alfred Flowers is a Black man, who resides in Minneapolis, Minnesota. He is an outspoken activist for minority rights, against police brutality and other forms of police misconduct, and served on the U.S.D.O.J. community Federal Mediation negotiating team.  For over a year he has lived down the block from the residence of Defendant Kevin Stoll, and within the boundaries of the Fifth Precinct of the Minneapolis Police Department ("MPD").  The "Flowers" family is the only Black family that lives on that block.

Defendant City of Minneapolis ("City") is a charter city in the State of Minnesota and a municipality for purposes of 42 U.S.C. § 1983.  The MPD is a department within the City.  (For

3

purposes of clarity, this Complaint will refer to the MPD, but all references to the MPD also refer to the defendant City).  For some purposes, the City is liable under the doctrine of *respondeat superior*.  The City is liable for conduct of the individual defendants, acting in their individual capacity, not simply due to the fact that they were employees of the MPD, but because the MPD did nothing to stop the illegal and/or unconstitutional conduct of the individuals, failed to have policies in place (or to discipline for violation of those policies) that would prevent individuals from misusing the authority and power of the MPD for their own illegally and/or unconstitutional purposes (and for other reasons as noted herein) and accordingly the MPD endorsed, ratified or even encouraged the torts alleged herein.

2.      Defendant (Lt.) Kevin Stoll ("Stoll") is an individual who resides in Minneapolis, Minnesota, and also is a Lt. in the MPD, assigned to the First Precinct.  All references to Stoll herein shall refer to him in both of these capacities, regardless of how the reference is articulated. In his capacity within the MPD he also has acted as "Car 9," the rotating duty as the highest-ranking-officer on duty in the City ("Car 9").  On one or more occasions relevant to this suit, Stoll was working Car 9, and as such either acted on behalf of the MPD, or gave the impression to other MPD personnel that he was acting on behalf of the MPD (and in a capacity where he was almost above question, due to that rank).  Using his Car 9 rank facilitated Stoll's illegal or unconstitutional conduct.  Stoll is sued in his individual and official capacities, and he acted with intent to harm, reckless disregard, deliberate or willful indifference, or with malice toward Flowers and his family.

3.      Defendant Sherry Appledorn ("Appledorn") is an individual who upon information and belief resides in Hennepin County, and who is also an employee of the Minneapolis Police Department, at times relevant, in the Organized Crime Unit ("OCU") of the

4

MPD.  All references to Appledorn herein shall refer to her in both of these capacities, regardless of how the reference is articulated.  Appledorn is sued in her individual and official capacities, and she acted with intent to harm, reckless disregard, deliberate or willful indifference, or with malice toward Flowers and his family.

4.      Defendant Erika Christensen ("Christensen") is an individual who upon information and belief resides in Hennepin County, and who is also an employee of the Minneapolis Police Department, at times relevant, in the Homicide Unit of the MPD.  All references to Christensen herein shall refer to her in both of these capacities, regardless of how the reference is articulated.  Christensen is sued in her individual and official capacities, and she acted with intent to harm, reckless disregard, deliberate or willful indifference, or with malice toward Flowers and his family.

5.      John-Jane Does 1-5 are reserved for other City officials or employees whose identities are unknown at time of filing.

**JURISDICTION**

6.      Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over this matter, which arises in part under the laws of the United States including 42 U.S.C. §1983.  This Court has the authority to take jurisdiction over all other claims, as supplemental jurisdiction.

**FACTUAL STATEMENT**

*September 27, 2003*[1]

7.      On September 27, 2003, Flowers went to a Minneapolis-branch NAACP ("NAACP") meeting held at the Urban League ("UL"), to speak about then-President Gallmon's

---

[1]      References herein to 9-27-03 are background, and to supply motivation for Stoll and other MPD personnel actions against Flowers.  Flowers does not herein sue out the claims that arose on 9-27-03 (excessive force, etc.), but reserves the right to bring those claims in a separate lawsuit.  This has already been discussed with counsel for the City and the parties agree that this split between the lawsuits is appropriate.

endorsement of Jennings for Superintendent of Minneapolis Schools, and to complain about the NAACP's use of federal funds in a local program and an overall abuse of NAACP funds.

8.      Audiotapes of the NAACP meeting prove that Flowers voiced his concerns in a normal, matter of fact way, and was not disruptive.  The Affidavit of NAACP member Carol White suggests that Gallmon's decision to call the police was motivated not by anything Flowers said or did, but that Gallmon falsely claimed Flowers was disruptive as a pretext to call police.

9.      Flowers has always argued that NAACP leadership used allegations against him to force an end to the meeting, when it looked like the meeting would have a negative impact on the current leadership.  NAACP leadership asked Torrence Abercrombie to call 911 and have Flowers ejected.  Abercrombie apparently became frustrated when police did not arrive quickly, so after repeated calls he finally called alleging Flowers had become "violent," even though there was no factual basis for any violent conduct by Flowers.  Later, Abercrombie would allege under oath that he only mean that Flowers was "verbally violent.")

10.      Minneapolis Police did eventually arrive.  UL Security-cam video footage proves that Flowers was already leaving on his own when Minneapolis Police Officers Becker and Tschida arrived.  After a brief interchange, Police left, and later admitted that Flowers had not engaged in any criminal conduct in the building.

11.      After he left the building, Flowers talked outside on his cell phone with UL Executive Director Clarence Hightower.  It is undisputed that Hightower told Flowers to go back into the building to put Abercrombie on the phone.  Video images prove that Flowers entered, and Abercrombie called 911 to say that Flowers had returned just as Flowers handed Abercrombie his cell phone.  After Abercrombie talked to Hightower on Flowers' cell phone,

Flowers left and was walking down the sidewalk when approached by Minneapolis Park Police Officer Mooney.

12.     Officer Mooney pulled his squad car to the wrong side of the street, followed Flowers down the block, then emerged from his car to speak with Flowers.  Video footage proves that within a matter of seconds, Mooney took Flowers to the ground.  Flowers hit his head, was stunned, and does not recall the next sequence of events.

13.     Eye-witnesses have testified under oath that Flowers was on the ground and hand-cuffed, then assaulted by police (including being kicked in the stomach area).  None of the violence by police was provoked or justified.  That Flowers was then hoisted to his feet and walked to a waiting squad car, where he was again the subject of assault by police, including kneeing him and choking him within inches of his life.  Eventually, a bystander intervened to save Flowers' life.

14.     To cover up their own misconduct (either as they own idea, or at the instruction of supervisors or both), Minneapolis police officers contrived a cover-up story, falsely alleging that Flowers had resisted arrest.  This was intentionally and skillfully designed to allege facts that would allow the MPD to commence a criminal action against Flowers.  The intentional nature of the fabricated story is supported by such facts as: i) Officer Tschida spent more than 1 hour studying the video footage from the UL security cams, and took notes during this study, then used the notes to prepare his police report (although he then destroyed the notes, a  violation of state law and a further indicia of cover-up); ii) supervisors and even Car 9 from that date met to confer and decide what to do; iii) Sgt. Shannon Barnette, who had not witnessed any portion of the incident, told Mooney to charge Flowers with obstructing legal process and disorderly conduct (typical "cover" charges to cover police misconduct); and iv) police got together in a

7

central location to create their police reports, and conferred about what to allege (the only way to succeed in having fabricated stories match); and v) Becker and Tschida changed places in the police-report-version of the incident, because Becker then had a civil action pending against him for police brutality.

15.     This fabrication of criminal charges against Flowers was part of an unconstitutional custom within the MPD (designed to misuse <u>Heck v. Humphrey</u>, which has been interpreted to disallow civil rights claims in federal court following convictions in state criminal court), and its use was well-known to police officers and supervisors.

16.     Upon information and belief police officers talked to each other about the fact that the criminal case against Flowers fabricated.  Based on some version of the blue code of silence, the unconstitutional custom and/or some other decision-making process by police officers that they should support each other rather than supporting the truth, numerous police officers aligned with Shannon Barnette and other officers involved in the 9-27-03 incident. That meant that those officer aligned against Flowers.  Indeed, policed believed that it was necessary to "take Flowers down" in the state criminal action, to prevent what they perceived would be a successful civil action based on the facts of 9-27-03.

17.     Part of this alignment between police officers on the force were, upon information and belief, conversations between Shannon Barnette and Stoll (or there may have been some intermediary).  Within days of the 9-27-03 incident, Stoll logged onto the MPD CAPRS electronic police report about the Flowers incident.  This shows his knowledge of the purported criminal case against Flowers, at the early stages.

18.     Many other officers within the MPD logged onto the CAPRS report to read it, and the Flowers case became well-known and talked about within the MPD.

19.     As is common in these types of "cover" cases, police support "their own" to the point where they are willing to commit other unconstitutional acts in order to: i) intimidate the complainer (in this case, Flowers) as punishment for complaining and to chill the rights of others; ii) harass the complainer to her him to drop his complaint; and/or iii) act out in other ways in response to the perception that the complainer is "winning" in state court.

20.     Flowers vigorously defended in state criminal court, directly alleging that the police were the criminals, and that the case against him was fabricated, in violation of his constitutional rights.  That this was Flowers' defense also became well-known within the MPD. Great numbers of Minneapolis Police Officers and supervisors who had no official duties involving the criminal case that arose on September 27, 2003, nonetheless spent City time and resources viewing the police report from that case.  Supervisors within the Police Department knew that this was occurring but did nothing to stop it.  Indeed, they condoned and encouraged it, as this is a regular practice inside the MPD (policy and/or custom) that wasted taxpayer dollars, spreads confidential information to those who have no need to know, and otherwise encouraged police gossip, collaborations designed to help each other cover up police misconduct, and other forms of unconstitutional and illegal conduct.

21.     In his state criminal defense, Flowers was able to obtain favorable discovery and favorable testimony from police officers at his pretrial hearings (which would assist him at trial), and this angered certain members of the MPD (for the reasons stated above).
However, Flowers was not ultimately successful in having his charges dismissed after pretrial hearings, and this emboldened certain police officers into believing that their fabricated scheme was working, and that, indeed, they were above the law.  Flowers continued to resist all pressure to plead guilty, and this also angered many within the MPD who feel affronted by anyone who

challenges what they believe should be total police power, not encumbered by the law or the constitution.

### *Stoll and Minneapolis Police Harassment of Alfred Flowers*

13.     Stoll learned about the ongoing state criminal case, and knew that it was headed for trial.  His unconstitutional goals included: i) punishing Flowers for alleging that police were the perpetrators and that the case was a cover-up; ii) intimidating Flowers into pleading guilty by having squad cars daily surround his house and "light it up" with spot lights (the idea was that Flowers had not been willing to plead guilty to date and was exercising his constitutional right to have the State prove its case at trial, but if his wife and children were at risk, perhaps he would re-evaluate and acquiesce in a plea for their safety); or iii) other interference with Flowers' constitutional rights in the state criminal action (such as punishing him for asserting his First Amendment for to petition government through his activist activities and membership on the Federal Mediation negotiating team) or his right to be free from unconstitutional conduct in other facets of his life.

14.     Stoll (alone or with others) set in motion a series of events intentionally designed to harm and defame Flowers and to abridge his constitutional rights.  He contrived to have the Fifth Precinct patrol officers patrol Flowers' precise address (this was not a generally patrolling of the neighborhood, but the precise targeting of Flowers' home).  On at least one occasion he spoke with Fifth Precinct personnel while he was on duty as Car 9.

15.     Shining a squad spotlight into a house is a common form of police harassment and intimidation employed by members of the MPD.  Starting in July, and continuing into August 2004, Minneapolis Police squad cars would drive by Flowers' house, while shining their spotlights into his house.  From inside the house, this is a terrifying experience.  Particularly for

those who have already felt the wrath of police who refuse to obey the law, Flowers and his family were worried that they would be harmed and *no one would come to their aid* - because they would side with police. Flowers knows that Minneapolis Police have guns and that some will enter a house without regard for the Fourth Amendment, and make up stories later to cover their actions.

16.     On one night in July 2004, 5-6 squads gathered outside Flowers' house. They approached his front door, implying that they had received a 911 complaint from a neighbor, and asked to come inside. He asserted his constitutional right to refuse their entry. They did not push inside, but they were not happy about it.

17.     Flowers' wife was scared. His children were terrified. They slept on the floor because they did not know if police were looking in the window, or about to come into the house.  One night, on or about August 10, 2004, the children observed a Minneapolis Police Squad drive up into the alley that is just behind their house, and get out of his car – coming toward the house. The children were terrified, and ran upstairs. When they came down, a window in the back door (nearest the alley) had been broken. Upon information and belief, the window was broken by the Police Officer. Squad 531 did record in its daily log for that date that it visited Flowers' house and that it checked the "alley."

18.     Flowers has obtained a number of daily logs for 5th Precinct squads for August 2004, and they do confirm visits to his address. These entries are mostly labeled "D.P." – direct patrol. This means that there was no 911 call, but police are themselves deciding to visit the house. Flowers has confirmed that no 911 calls were made by neighbors, complaining about him or his house, the entire summer.

19.     The squads continued to come around, shining their spotlights into Flowers' windows, usually between 8:30 p.m. and 1:00 a.m.  Tension grew in the house, and the fear level continued to rise.  The children began sleeping on the floors of their bedrooms, worried that police would come into the house.

20.     In mid August, Flowers had his attorney contact MPD Police Administration to report the harassment.  Upon information and belief, following that initial complaint, 5th Precinct Inspector Arneson gave a direct order to her officers to stop harassing Flowers, and to stop driving by his address.  Even faced with a <u>direct order from a superior officer</u>, the officers did not stop their harassment of the Flowers' house.  This is evidence of lawlessness.  It is evidence that some MPD Officers do not respect the law, do not respect authority, and are out of control.

21.     As trial in the state criminal action drew closer, the harassment of Flowers escalated.  After the Minnesota Court of Appeals denied Flowers' Petition for Writs on August 27, 2004, which upon information and belief traveled quickly inside the MPD grapevine and emboldened police, Flowers learned that Stoll had publicly promised at a roll call in the Fifth Precinct that he would buy a steak dinner for any officer who could "get" Flowers.  Flowers took this use of the word "get" to mean that false criminal charges would be alleged against him.  (At the time, he did not consider the possibility that "get" could mean something far more sinister. But even the interpretation Flowers placed on the term at the time was frightening enough.)  A false arrest by force can result in bodily harm or death (or false criminal charges), and police have been successful in the past fabricating an alleged use of force by the Black man, to cover up their own misconduct.  This is an effective way for police to kill the victims of their misconduct without consequences, particularly when those victims are characterized as a threat to the officer(s).  This is a harsh reality for Black men in Minneapolis, and there are a myriad of studies

that support the grossly disparate treatment of Blacks by police.  Minnesota has had the worst

record of any state in the nation, for the disproportionate conviction of Blacks.

22.     The harassment seemed designed to cause an arrest of Flowers prior to or during

trial or to otherwise punish Flowers for exercising his right to complain about police misconduct

and/or to pursue a defense in this criminal case.  By harassing him so close to trial police can

accomplish several things:  1) distract his attorney so that she cannot spend adequate time

preparing his defense for trial; 2) put Flowers in jail, so that he is in custody during trial, limiting

his effectiveness during trial or tainting the jury pool by disseminating the information via local

media; and/or 3) disrupt the trial itself.

23.     Computer records from the Minneapolis Police Department prove that Defendant

Stoll used a computer to access and view the Minneapolis Police Report about the September 27,

2003 event that led to Flowers prosecution.  There is no legitimate reason for Stoll, who is

assigned to the 1st Precinct, and who was not at the scene, consulted at the time, or otherwise

assigned any duties on that case, to view the Minneapolis Police Report for that incident.  Yet he

did so within days of the incident.  And then he accessed that electronic police report again in

August 2004.

24.     In addition, once Stoll (or other MPD officer) drew her attention to it, Officer

Sherry Appledorn of the Gang Unit, also accessed Flowers' CAPRS report.  There was no

legitimate reason for her to do so.  Upon information and belief Appledorn knew that Flowers

was asserting his right zealously to represent himself in the state criminal action that arose due to

the September 27, 2003 incident.  And upon information and belief Appledorn had spoken with

one or more individuals who were involved in testifying in that case for the MPD (and

Appledorn told Christensen although there was no legitimate or authorized reason for

Christensen to know), and was motivated by an unconstitutional motive to support her friends in the MPD (including but not limited to engaging in conduct designed to intimidate Flowers into pleading guilty out of fear for himself or his family, or designed to punish Flowers for asserting his constitutional right to defend himself in the state criminal action or to chill the rights of others who might consider zealously defending themselves in state criminal actions, particularly those actions where police had falsified allegations of obstructing legal process in order to cover up police misconduct) rather than to do her job at the MPD with neutrality and in furtherance of fighting real crime and/or in pursuit of justice.

25.     Upon information and belief Appledorn had been requested by Stoll to document some kind of wrongdoing or gang activity by Flowers, his family, or members of his household, and Appledorn knew that that was not due to some justifiable MPD investigation.  Rather, Appledorn knew that the goal of the documentation was to defame and/or intimidate Flowers. Upon information and belief Appledorn was not assigned by any management in the gang unit to investigate Flowers, and no legitimate reason for investigating him or his household was ever proffered to her.  Instead, Appledorn knowingly engaged in a plan to harm Flowers or intimidate him and/or his family or household (or other unconstitutional motive or plan to harm Flowes). Appledorn knowingly created false documentation, which she knew Stoll intended to use to harm Flowers and/or his household, or to put them in harm's way (Appledorn knew that the MPD did at times seek no-knock warrants to enter alleged gang houses, and knew that the results of those raids could reasonably include the use of force, and Appledorn knew or should have known that Flowers' minor children resided in the house and could be harmed by a no-knock entry into the household).  Appledorn knew or should have known that Stoll intended to use the documentation she created (which Appledorn knew contained false information or which Appledorn did not

appropriately investigate to determine its truth or falsity) against Flowers or his family or household.

26.     Then, later on Friday afternoon, August 27, 2004, Flowers learned from a police officer that police had put out a "hit" on him.

27.     Flowers was already in the process of complaining to Minneapolis Internal Affairs about the continued harassment, and the promise of a "steak dinner."  Once he learned there was a "hit" out on him, he included this in his complaint to Internal Affairs.  His attorney also contacted the U.S. Attorney's Office.

28.     Flowers' Attorney spoke with the Acting U.S. Attorney.   He recommended that Flowers' attorney call the Federal Bureau of Investigation ("F.B.I.").
Flowers' Attorney then called and reported the threats by Minneapolis Police to the F.B.I.  She expressed concern that she could not file for a TRO in federal court until Monday morning, and was concerned what might take place over the weekend.  The F.B.I. suggested that Flowers be moved to a location away from his house and out of the City, for the weekend.

29.     While plans were being made to move Flowers out of the City, Flowers and Clemons learned even more disturbing information – that MPD Lt. Kevin Stoll had abused the MPD "alert" process, which enables officers to "alert" fellow officers about known criminals so they can be on the look-out for them.  Lt. Stoll, working with Officer Appledorn of the OCU, caused the MPD issue an "alert" that listed Flowers' house as a known gang house.  Upon information and belief it listed Flowers as a gang member and convicted criminal, and relatives of Flowers as "criminal associates."  There *has never been any* factual basis for the "alert." Flowers has never been alleged to be involved with any gang, nor is his house a gang or drug house.  (Flowers is a daycare provider.  His house is clean, his wife has taken care with interior

decorating, and it is full of children.)  Clemons has a clean criminal record.  The only

Minneapolis Police case in the system regarding Flowers and Clemons was *the state criminal*

*case* described above (which Flowers and Clemons won and which never resulted in a convicted,

therefore no criminal conduct occurred).  The "alert" (by whatever name given to it by Police,

and however disseminated) caused additional concern, because it was clearly designed to put the

Flowers house at risk.  Police Officers who did not know Flowers would suspect criminal

dealings, guns and drugs, which could motivate a forced and armed entry and police shootings

and death.  Police Officers with a vendetta against Flowers could intentionally perpetrate

violence against Flowers, then use the "alert" to justify their conduct.  It appeared that the "alert"

might have been read city-wide, at every roll call, during every shift, at every precinct.

     30.    Flowers contacted his attorney.  Before attorneys arrived at the Flowers residence,

Lt. Stoll was observed driving past in his convertible several times, stopping by Flowers'

vehicle, and looking toward the house.  After the attorneys arrived, Lt. Stoll was observed

driving past the Flowers residence at least 2 more times.  The first time, he turned his lights off

when he drove passed, but just in front of Flowers' house.  The result was quite intimidating.

Stoll also slowed down when he came to Flowers' attorney's car, as if he was checking license

plate number (upon information and belief Stoll had run other license plates parked in front of

the house, and listed those people on the gang "alert").  Flowers' attorney observed how much

tension this caused to the residents of the house.  She personally observed the level of

intimidation that police can cause when they drive by a house, with known malicious intent.  The

impact is far more devastating than being harassed by the average citizen, because you know that

the individual/s is armed, and because you know that they have power and authority which they

are willing to abuse.

31.     Flowers' attorney contacted Minneapolis Police Chief McManus directly a short time after Flowers learned about the "alert."  She complained about all of the above, let him know the fear level in the Flowers' household, and that Flowers legitimately feared for his life. She also asked that the "Alert" be immediately retracted, so that no officer can claim the alert as justification for attack.  She reported that the refusal by Police Officers to follow the direct order of their Precinct Inspector was perhaps the most frightening aspect.
Flowers was then moved out of the City.

32.     Apparently upper management of the MPD did give orders that night, for their officers to stand down – to cease and desist driving by the Flowers house.  But that order had been disobeyed before, and Flowers learned that several officers were "unhappy" about the order that was reiterated on August 27, and he fears further lawlessness and refusal to comply with order.

33.     Flowers' attorney has had to deal with police harassment since she became aware of it, and, it has taken time away from trial preparation.

34.     By Saturday morning, August 28, 2004, the Minneapolis Police had already learned from their sources that Flowers was out of his house, and that he was receiving phone calls from MPD upper management on his cell phone in his (hopefully) secure location.

35.     Also on Saturday morning, August 28, 2004, Deputy Chief Dolan visited Stoll at his home.  At that point, Stoll became aware of Flowers' complaint about *him*.  Upon information and belief, Dolan told Stoll that he was going to be investigated and to get prepared, including prepare a chronology of events that he could use to defend himself.

17

36.     Other than the call to Flowers on that Saturday morning, Flowers and his attorney have not received any communication from MPD that, and do not know whether the "alert" was deleted and its falsity announced.

37.     Defendant Stoll has told neighbors about Flowers being a gang member, and/or his house a gang house. These are false and malicious lies, intended to turn Flowers' neighbors against him. Stoll has admitted that he was trying to get Flowers (or someone in that household) either convicted of a crime or evicted from his residence. Upon information and belief Stoll's communication to neighbors has resulted in at least one neighbor complaining to MPD about the "trash" and a gang house on her block. In addition, a Sgt. from another Unit has told Flowers' neighbors that he is a gang member, or that his house is a gang house. That Sgt. even named the gang that she was accusing Flowers of being involved with. By doing that, she risked that rival gangs would learn this information, and that *they* would perpetrate violence against Flowers or his family. That Sgt. is friends with Officer Appledorn, and upon information and belief learned the "gang" rumor from her, and therefore also knew its falsity. These are either intentional falsities, or were made with reckless disregard for Flowers' rights and safety (and that of his family). MPD's records show no complaints from neighbors including specific evidence of Flowers' house being involved with a gang, except for a report from Defendant Stoll.
The result is that Flowers' reputation has been damaged. Alleging that a Black man is a gang member implies that he is criminal and violent. Because of society having been inundated with negative media images of Black men, and therefore their ready willingness to view Black men as dangerous, this damages to Flowers' reputation could be permanent, and no matter what he does to try to rectify it, it may follow him for life.

38.     Flowers has observed that neighbors that were once friendly do not want to speak with him.  After Defendants herein began disseminating defamatory information about Flowers, one neighbor referred to the residents of the Flowers' household as "trash."  Upon information and belief, this is because they have been told by Stoll or other MPD Officers that Flowers is a gang member, or that his house is a gang house, or that Flowers or someone living in his house is a criminal.  Stoll also disseminated other false information, including that Flowers' household had loud music playing at night or was responsible for a "boomer" car that had passed through the neighborhood late one night.  Defendants also disseminated false  information that Flowers and/or someone living in his household were responsible for the graffiti in the larger neighborhood (and asserted that that graffiti was gang graffiti without any support therefore).  Stoll disseminated false information that there was gang graffiti on the house that the Flowers lived in.

39.     Defendant Erica Christensen published false information about Flowers to one or more neighbors of Flowers, including Witness A, telling him (without any basis in fact, and either knowingly false and/or without appropriate investigate to determine its truth or falsity) that Flowers was a member of a specific gang (Gangster Disciples).  Christensen was motivated by an unconstitutional motive to support her friends in the MPD (including but not limited to engaging in conduct designed to intimidate Flowers into pleading guilty out of fear for himself or his family, or designed to punish Flowers for asserting his constitutional right to defend himself in the state criminal action or to chill the rights of others who might consider zealously defending themselves in state criminal actions, particularly those actions where police had falsified allegations of obstructing legal process in order to cover up police misconduct) rather than to do her job at the MPD with neutrality and in furtherance of fighting real crime and/or in pursuit of

justice.  Appledorn knew that Christensen was disseminating that false information, and did nothing to correct Christensen's false impression of the facts, or otherwise intended that Christensen circulate the false information.  Christensen knew or should have known that the information was false, and knew or should have known that circulating that kind of false information could result in harm to Flowers or his family or household, either by police officers entering on a no-knock warrant, or by real gangmembers.

40.     When Flowers filed an affidavit from Witness A (who was scared to disclose his identity), Christensen again visited that individual, and further intimidated him because he had "told" that she had earlier visited and spread false rumors about Flowers.

41.     This case began with a Park Police Officer taking Flowers to the ground.  On September 2, 2004, a Minneapolis Park Police Officer assigned to a middle school, approached Flowers' daughter and asked if she knew or was related to Alisa Clemons.  She confirmed that Clemons was her aunt.  There was no legitimate reason for the Officer to approach the daughter, or to ask about Clemons.  Flowers fears that police may harm his daughter, and his attorney notified the Chief of Park Police.

### Members of MPD work to cover up misconduct

42.     Minneapolis Police Officers have a network (policy and/or custom) designed to help each other cover up their illegal or unconstitutional activities, and that Officers and supervisors have actively worked to destroy evidence, or to fabricate "justification" for the illegal conduct complained of herein.  Once Flowers disclosed the illegal and/or unconstitutional actions and motivations of the individual defendants herein, certain supervisors within the MPD responded by working to articulate a justification for the conduct of defendants which was known to be illegal and/or unconstitutional.  This was a further violation of law and/or constitution/s.

43.     For example, after Flowers filed this case and a motion for temporary restraining order ("TRO") with this Court, individuals within the MPD *created* for the first time, some police reports that Stoll and the City then used to try to justify their conduct.  Indeed, both Stoll and the City cited to those police reports in their responsive papers to the TRO.

44.     Flowers raised these harassment issues in his state criminal action.  In that action, an attorney for the MPD appeared in Court, and, although Stoll was under investigation by Internal Affairs, went on public record saying that Deputy Chief Dolan had told him that there was evidence supporting Stoll's actions, and alleging that there was evidence supporting them (not verbatim but transcript incorporated by reference).  Flowers promptly subpoena'd all documents supporting that contention, although it was some time before he received them.  In fact, the attorney for the MPD delivered the police reports (which purportedly supported Stoll's actions, but were not created until after this action was filed) to the prosecutors in the state criminal action, before delivering them to Flowers, who had subpoena'd them.  The police reports did not contain one single piece of evidence about Flowers or his house.  Instead, they contained complaints about various locations within an approximate 10-block area, and alleged that in some of these locations there had been "gang" graffiti.  After receiving those police reports, Flowers sought and obtained computer records that prove that the police reports were not created until after this action was filed.  Further, the police reports referenced some color pictures.  Flowers demanded those.  When he received them, it became clear that the pictures did not show gang graffiti.  Someone had contrived to make a "GO" become "GD" (for gangster disciples), but neither that nor any of the other graffiti appeared to be gang graffiti. Although challenged to do so prior to the TRO hearing, neither Defendant has been able to provide any

basis for alleging that that graffiti was gang graffiti.  Upon information and belief the graffiti was created by white youth in the neighborhood.

45.     Stoll also filed an affidavit in response to the TRO, which tried to justify his actions.  In that affidavit he alleges that Flowers' daughter is a gang member (conveniently leaving out the name of the daughter, to make it difficult to prove otherwise).  That allegation was knowingly false, and there is no evidence to support it.  The allegation was made in order to keep Flowers from obtaining a TRO.

46.     Stoll's affidavit also alleged that he had received information from a City Council member's office about Flowers' house.  Upon information and belief one or more City Council members knew or had reason to know that Flowers was being illegally targeted.

47.     As the state criminal trial went on, Flowers continued to assert his right to information requested by subpoena in that action.  The attorney for the MPD stalled and delayed (even though he knew that Flowers was urgently demanding all information for use in his criminal trial), until after the state criminal case was sent to the jury (in other words, *after* Flowers would have been able to make use of it).  After Flowers received permission from the state criminal judge to file an offer of proof on the Stoll issue (which did not become necessary, since the jury came back with a full acquittal), Flowers' attorney was able to obtain the information that had been withheld from Flowers during the state criminal trial.  This information contained the "packet" of information that Appledorn had provided to Stoll (none of which supported the allegations made against Flowers or his house), as well as the memorandum that Flowers has referred to herein as the "alert."  The "alert" proved that even Stoll's affidavit to this Court was false; there is no factual support for Flowers or any of his daughters being "gang members," and Stoll knew it before he signed under oath an affidavit for this Court.

## COUNT I
### Violation of 42 U.S.C. §1983
### (Against all Defendants)

48.     Plaintiff realleges all foregoing information as if fully set forth herein.

49.     Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

50.     This claim arises under Title 42 of the United States Code (Civil Rights Act of 1964, as amended), including but not limited to §1983.

51.     Defendants acted alone and/or together (2 or more in concert), and one or more of them committed some act in furtherance of the conspiracy to violate Plaintiff's rights (and Plaintiff was damaged).

52.     Defendants deprived Plaintiff of his rights, privileges, and immunities secured by the United States Constitution, and specifically the Fourteenth Amendment to the United States Constitution, in conjunction with other rights, including but not limited to the following clearly established rights:

a.      **Substantive due process**.  Defendants' actions, harassing and terrorizing Flowers, and his wife and children, misusing police processes in order to incite violence against Flowers, to the point where Flowers no longer feels physically safe in his home and fears for the safety of his family, shocks the conscience of the community.

b.      **Procedural due process and/or equal protection**.  Harassing Flowers because he has asserted his constitutional right to defend himself in a state criminal action, or because he exercised his constitutional right to complain about government, violates his constitutional rights (sometimes described by courts as violation of due process, and sometimes as violation of equal protection).

c.      **Sixth Amendment right to Effective Assistance of Counsel**.  Conduct of Lt. Stoll and other MPD Officers as set forth herein has compromised Flowers' Sixth Amendment right to effective assistance of counsel, because his attorney has been busy due to the harassment issues, rather than concentrating on preparing for trial.

    d.    **Equal protection of the laws**. Flowers is a Black man. Minnesota statute relating to identification as gang member require that specific criteria be met, rather than judging someone as a gang member because of their "appearance." Flowers was identified as a gang member either because he is Black, or because he has asserted his constitutional rights (as described herein) and as such has been denied equal protection of the law. He has been mistreated either due to his class – Black – or because he is an *Olech* "class of one."

    e.    **Access to courts/retaliation (or other articulations found in the First Amendment, such as the right to petition government for change)**: The conduct of Defendants denies Flowers access to Court in his own defense in the state criminal action, or retaliates against him for asserting his First Amendment rights. Defendants' false allegations about Flowers has caused even Flowers' City Councilmember to refuse to speak with Flowers, which has violated Flowers' right to petition his government for change.

    f.    **Failure to Protect**: Several Minneapolis Police Officers and Supervisors knew that Minneapolis police officers were harassing and threatening Flowers, and they failed to do their duty to protect Flowers.

53.    Defendants (and each of them) knew they were violating the federal law and constitutional rights of Plaintiff and/or acted with deliberate indifference to the rights of Plaintiff (or acted intentionally to harm, or with reckless disregard for the rights of Flowers) as noted above. The Defendants acted under color of law (public officials acting alone and/or conspiring with private officials) of a statute, ordinance, regulation, resolution, policy, custom or usage when they deprived Plaintiff of his Constitutional rights, privileges, and immunities. MPD Officers and supervisors acted with reckless disregard or with deliberate indifference to the rights of Plaintiff, or they acted with intent to harm.

54.    As a direct and proximate result of the Defendants' conduct, inaction, policy or customs as set forth in more detail above, Plaintiff suffered the deprivation of his constitutional

and/or federal statutory rights and suffered personal injuries, including injury to her career/loss of income, humiliation, mental anguish and suffering, and emotional distress.  Violative policies and/or customs of the MPD include but are not limited to:

Providing easy and unmonitored or scrutinized access to officers (particularly supervisors) to misuse police authority or services, for their own vendettas or otherwise illegal or unconstitutional motives.

55.    Condoning police officer misuse of the MPD authority or services to retaliate against those who assert their constitutional rights (e.g., to defending in a criminal action or to petition government regarding police misconduct).

56.    Providing easy and unmonitored or scrutinized ability to officers (particularly supervisors) to list someone as a "gang" member without that individual meeting any of the criteria for "gang member" under Minnesota law, thereby placing the individual at risk.

Failing to have any checks and balances to prevent misuse of the term "gang" member (which does not fit the statutory criteria) or the "gang" database (where police list individuals at "gang" members).

57.    Placing individuals on the "gang" list merely because of their race, rather than due to their meeting 3 of the 10 criteria under Minnesota law required to identify an individual as a gang member.

58.    Failing to monitor activities of police to prevent violation of constitutional rights of members of the public (including but not limited to criminal assaults by police; misuse of the criminal charging authority; and retaliation for exercise of constitutional right to complain about police or defend a criminal action commenced by Minneapolis Police).

Failing to discipline or provide other consequences for police who violate the constitutional rights of members of the public (see list directly above).

59.    By reason of the foregoing, Plaintiff is entitled to a negative injunction against Defendants, prohibiting them from further harassing, threatening, retaliating, intimidating, or tampering with Flowers, and a mandatory injunction requiring Defendant MPD to delete the "alert"

from its computer systems, to delete Flowers' name from the "gang" database, and affirmatively to notify all police who were told that Flowers' house was a "gang" house, that that information was false, and that no one with a criminal record lives at his house, and to compensatory and other damages for harm as noted herein.

## COUNT II
### Violation of 42 U.S.C. §1981
### (Against City)

60.     Plaintiff realleges the above allegations as if hereinafter set forth in full and further state and allege as follows:

61.     The facts that Defendants herein used to justify and/or cover up their conduct as to why they disseminated information about Flowers or some member of his household being a gang member (such as that a boomer car drove through the neighbor, or that there was graffiti on the block), was information that also applied to all other houses on the block, including Stoll's.  Yet the target of the information was the only Black/African-American family on the block.  Minnesota state statute The conduct of Minneapolis Police Officers caused Flowers and/or his household to be called "trash" by neighbors, and otherwise resulted in racist conduct toward the Flowers' household.

62.     Defendant City violated §1981 because it intentionally engaged in racially-motivated abuse of government power, denied Plaintiffs the full and equal benefit of the state criminal laws and like punishment.  State criminal laws are designed to deter crime against all residents of and visitors to the City, to protect all members of the public, and to punish those who offend.  The City's intentional protection of criminal conduct committed by police officers likewise denied Robinson the full and equal benefit of the laws.

63.     By reason of the foregoing, Plaintiffs are entitled to the Relief set forth in the Prayer and qualified above.

## COUNT III
### Defamation
### (Against all Defendants)

64.     Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

65.     Defendants published and/or disseminated statements in a widespread manner (including but not limited to Flowers' neighbors, and to a City Council member's office, and to those inside the MPD that had not reason or right to know of any ongoing investigation) regarding Flowers and/or his family and/or household, and concerning his honesty and credibility and reputation, and alleged criminal history and/or activity, and in particular alleged that Flowers was a "gang" member, that a member of his household was a "gang" member, that his daughter was a "gang" member, which were untrue, malicious, and defamatory of Plaintiff's personal, professional, and business reputation, and in the State criminal justice system.

66.     Defendant made the accusations against Plaintiff with knowledge of their falsity, and without any proof, factual foundation, or reasonable and probable grounds, with the intent to injure and permanently damage Plaintiff in his career, good name, and professional and personal reputation and career, and in the state criminal justice system.

67.     Defendant's statements about Plaintiff were not privileged, were made in bad faith, and with malice, and one or more of them constitute defamation *per se*.

68.     As a direct and proximate result of defendants' intentional defamation of Plaintiff, Plaintiff has suffered, and continues to suffer damages and other harm in a reasonable amount in excess of $50,000.

## COUNT IV
### Violations of Minnesota Constitution
### (Against all Defendants)

69.     Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

70.     For the reasons set forth above (even if the Minnesota Constitution contains a slightly different articulation of Plaintiff's rights), Plaintiffs rights under the Minnesota Constitution were violated, Plaintiff was damaged, and/or is entitled to an injunction.

27

## COUNT V
### Intentional Infliction of Emotional Distress
### (Against all Defendants)

71.     Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

72.     The aforesaid conduct and other conduct by Defendants was done intentionally, was outrageous, shocks the conscience, and has caused Plaintiff to suffer severe emotional distress and mental anguish.

73.     As a result of the foregoing, Plaintiff has suffered damages, including extreme emotional distress and mental anguish, pain and suffering, and other harm in a reasonable amount in excess of $50,000.

## COUNT VI
### Negligent Infliction of Emotional Distress
### (Against all Defendants)

74.     Plaintiff Dunham realleges the above allegations as if hereinafter set forth in full and further state and allege as follows:

75.     The aforesaid conduct by Defendants was done negligently and carelessly, was outrageous, and caused Plaintiff to suffer severe emotional distress and mental anguish.  Plaintiff specifically pleads that the tort underlying the negligent infliction of emotional distress is defamation, but also seeks to have this Court consider the torts that are or may be claimed in this action.[2]

76.     As a result of the foregoing, Plaintiff has suffered damages, including physical injury, emotional distress and mental anguish, pain and suffering, and other harm in a reasonable amount in excess of $50,000.

---

[2]     If this is not the Court's reading of the current law, then Plaintiffs makes a good faith request for a change in the law.

77.     Plaintiff is entitled to recover damages directly and proximately caused by the negligent infliction of emotional distress and other damages permitted under this cause of action in a sum in excess of $50,000.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief in the form of an injunction against Defendants, and each of them, and/or as follows:

1.     Judgment in a reasonable amount in excess of $50,000, and including but not limited to compensatory, presumed and punitive damages (Plaintiff reserves the right to bring a motion to add punitive damages to state-law claims);

2.     Interest on the aforesaid amounts;

3.     Awarding to Plaintiff his reasonable attorney fees and costs and disbursements incurred herein; and

4.     Issuing a temporary and/or permanent prohibitory injunction prohibiting Defendants, their officers, agents, employees, and successors, from engaging in the illegal practices complained of herein.

***

Plaintiff hereby demands a trial by jury on all applicable Counts.  Plaintiff reserves the right to amend to add a claim for punitive damages under State law.

Dated:  December 1, 2004                    **ATTORNEYS FOR PLAINTIFF**
                                            **JILL CLARK, P.A.**


                                            __s/jillclark_____
                                            By:  Jill Clark, Esq. (#196988)
                                            2005 Aquila Avenue North
                                            Minneapolis, MN 55427
                                            PH:  (763) 417-9102